# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Christopher Lollie,<br><br>        Plaintiff,<br><br>v.<br><br>Officers Michael Johnson, Lori Hayne, and Bruce Schmidt, and the City of St. Paul,<br><br>        Defendants. | Case No. 14-cv-4784 (SRN/HB)<br><br><br><br>**MEMORANDUM OPINION AND ORDER** |

Andrew M. Irlbeck, 332 Minnesota St., Ste. W-1610, St. Paul, MN 55101, and Paul Applebaum, Applebaum Law Firm, 332 Minnesota St., Ste. W-1610, St. Paul, MN, 55101, for Plaintiff.

Judith A. Hanson, St. Paul City Attorney's Office, 15 West Kellogg Blvd., Ste. 750, St. Paul, MN 55102, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendants Michael Johnson's, Lori Hayne's, Bruce Schmidt's, and the City of St. Paul's (collectively, "Defendants") Motion for Summary Judgment [Doc. No. 27]. For the reasons set forth below, the Motion is granted in part and denied in part.

Additionally, in his opposition briefing to Defendants' Motion, Plaintiff Christopher Lollie seeks to add a new claim against Defendant Lori Hayne, alleging Defendant Hayne failed to intervene and prevent her fellow officers from using excessive force in violation of 42 U.S.C. § 1983. (See Pl.'s Mem. in Opp. to Defs.' Mot. for Summary Judgment ("Pl.'s Opp.") at 36–37 [Doc. No. 33].) The Court construes this request as a motion to amend

pursuant to Federal Rule of Civil Procedure 15(a)(2).  For the reasons set forth below, Lollie's motion to amend is denied.

## I.   INTRODUCTION

This suit stems from the arrest of Plaintiff Christopher Lollie ("Lollie") by St. Paul police officers Michael Johnson ("Johnson"), Lori Hayne ("Hayne"), and Bruce Schmidt ("Schmidt") (collectively, "the Officers").  Much, but not all, of this incident was captured on video.  Many facts surrounding this incident are disputed.  For clarity's sake, the Court notes the relevant disputes, but the standard on summary judgment requires that all facts and evidence be viewed in the light most favorable to Lollie, the non-moving party.  See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000).

## II.   BACKGROUND

Lollie was arrested on the morning of January 31, 2014 in the pedestrian skyway of downtown St. Paul, Minnesota.  At the time, Lollie worked two jobs, one as a music instructor at area schools and the other as an over-night custodian at a St. Paul business.  (Aff. of Andrew Irlbeck ("Irlbeck Aff."), Ex. 5 ("Lollie Depo.") at 15–16, 20 [Doc. No. 34].[1])  Lollie is also the father of four children.  (Lollie Depo. at 13.)

### A.  Lollie at the First National Bank Building

Lollie and the mother of his children had a regular routine for exchanging their children to ensure the children were cared for during the time both parents were at work.

---

[1] Lollie's evidence was presented to the Court through exhibits attached to the Affidavit of Andrew Irlbeck.  For the sake of brevity and clarity, the Court will first cite to the specific exhibit and name it, but thereafter references only the assigned name. Additionally, when any deposition is cited, the pages referenced are those found in the deposition itself, not those assigned by ECF.

2

The children and their mother took a bus to downtown St. Paul on her way to work, arriving at the downtown St. Paul bus stop generally between 9:30am and 10:30am.  (See id. at 55–56.)  Since Lollie left work between 9:00am and 11:00am, he would either meet the children at the bus stop, or the children would attend daycare at a facility near the bus stop until he picked them up.  (Id.)  On January 31, 2014, Lollie got off of work at 9:00am and walked to downtown St. Paul to meet his children at the bus stop.  (Id. at 55.)  He arrived at the bus stop in time to see that his children were not on the 9:30am bus.  (Id.)  Lollie then checked at the daycare center and was informed the children had yet to arrive.  (Id. at 56.)  Since Lollie knew the next bus would not come until 10:00am and it was cold outside, he decided to wait for his children in one of the buildings between the bus stop and the daycare center.  (Id. at 56–57.)

Lollie first entered the Securian Building, where the daycare facility is located, but found that the public seating area of the pedestrian skyway in that building was full.  (Id.)  He then traveled a few buildings over to the First National Bank Building ("FNBB") where he found an open chair in a seating area[2] located in the north-south portion of the skyway at

---

[2] Whether the skyway seating area at FNBB was a public or private area is disputed.  (See Pl.'s Opp. at 15–18 (presenting evidence the area is considered public); Defs.' Reply at 2–3 (arguing the area is private) [Doc. No. 35].)  Defendants did not present their expert's survey of the area in a timely fashion in accordance with the Federal Rules of Civil Procedure or the scheduling orders of this Court.  As a result, that evidence was stricken for the purposes of deciding summary judgment.  (See Court Minutes dated 12/7/2015 [Doc. No. 41].)  However, as explained later, deciding whether the FNBB seating area was public or private is not really material to ruling on Defendants' Motion for Summary Judgment.

approximately 9:34am.  (Id. at 57; Irlbeck Aff., Ex. 2 ("FNBB Video") at 9:34:20.[3])  At the

time, there were no signs or any other indication that this seating area was private.  (See

Lollie Depo. at 58; Irlbeck Aff., Ex. 9 ("Wickre Depo.") at 70; Irlbeck Aff., Ex. 6 ("Johnson

Depo.") at 12, 22–23, 35; Irlbeck Aff., Ex. 7 ("Hayne Depo.") at 30–31; Irlbeck Aff., Ex. 8

("Schmidt Depo.") at 35.)   After sitting down, Lollie used his phone to check Facebook.

(Lollie Depo. at 51.)  There is no allegation that at any time Lollie was loud, boisterous, or

otherwise disruptive.  (See FNBB Video at 9:34:20–9:40:03 (although the FNBB security

video does not contain audio, one can see that Lollie does not appear disruptive, nor do any

passersby or FNBB security appear to notice him).)  Other people sat in the chairs around

Lollie during this time.  (Id.)

    At approximately 9:40am, FNBB security officer David Wickre ("Wickre")

approached Lollie and asked him what he was doing there.  (Lollie Depo. at 51, 57; see

FNBB Video at 9:40:03.)  Lollie replied that he was waiting for his children to arrive at the

daycare center located a few buildings over.  (Lollie Depo. at 57–58.)  Wickre informed

Lollie that he could not sit there while waiting because it was a private seating area.  (Lollie

Depo. at 58.)  Lollie and Wickre then argued about whether the area was in fact private or

public.[4]  (See id.; Wickre Depo. at 53–54, 66.)  Wickre informed Lollie he had to leave or

Wickre would call the police.  (Lollie Depo. at 58–59.)  Lollie did not leave immediately,

---

[3] The Court cites to the time stamp designations as they appear on the FNBB video itself.

[4] Precisely what each individual said during this argument is disputed, but immaterial to
resolving the Motion before the Court.

but instead remained in the FNBB skyway seating area for approximately ten minutes.  (See id.; FNBB Video at 9:40:35–9:50:02.)

Wickre instructed his fellow FNBB security officer, Tou Yang ("Yang"), to call the police because Lollie would not leave.  (Irlbeck Aff., Ex. 11 ("Yang Aff.") at ¶ 2.)  Yang contacted the St. Paul Police, but what exactly he reported is disputed.  Yang says he gave a physical description of Lollie and stated that "[Lollie] was being 'uncooperative.'"  (Yang Aff. at ¶ 3.)  Hayne recalls that Yang said the "uncooperative male" was sitting in a "private tenant/employee area and would not leave."  (Hayne Depo. at 48, 55–56.)  However, Hayne's police report, written shortly after Lollie's arrest, makes no mention of the call stating that the uncooperative male was in a private seating area.  (Id. at 58; Irlbeck Aff., Ex. 17 ("Police Reports") at 12.[5])  Johnson recalls Yang reporting an uncooperative male, but it is unclear whether he recalls any mention of this individual refusing to leave a seating area.  (See Johnson Depo. at 27–29.)  Johnson's report from that day describes the call as an "uncooperative male refusing to leave."  (Police Reports at 6.)  Schmidt states that the call reported an "uncooperative male" along with a physical description of Lollie, but Schmidt did not mention that the call contained any description of a seating area or refusal to leave.  (Schmidt Depo. at 17.)  Schmidt's report from the day of the incident described the call as a "disorderly[6] uncooperative" male matching Lollie's description, but makes no mention of a seating area or refusal to leave.  (Police Reports at 17.)  Thus, it is undisputed that Yang

---

[5] The ECF page number is cited for the Police Reports as multiple reports are contained within the same exhibit.

[6] During his deposition, Schmidt claims his report does not contain a mention of "disorderly." (Schmidt Depo. at 17.)

reported an uncooperative male matching Lollie's description.   However, it is disputed whether this initial report mentioned a refusal to leave any particular area in the FNBB and whether that report described Lollie's conduct as being more than uncooperative.

While Johnson and Schmidt were en route, Johnson called Yang for more information.  (Johnson Depo. at 29.)  Yang says he again provided Lollie's description and stated that Lollie "had been in the skyway seating area, and that he had left already."  (Yang Aff. at ¶ 4.)  Johnson says Yang described "a male sitting in [the FNBB's] employee only seating area" who refused to leave when asked.  (Johnson Depo. at 29.)  Johnson also claims that Yang explained that the seating area was for employees or clients of the FNBB only. (Id.; see Police Reports at 6.)  There is no indication that the information Johnson received from Yang was communicated to Hayne.

**B.  Hayne and Lollie "Walk and Talk" Through the Skyway**

At approximately 9:50am, Lollie left the seating area and began to walk through the skyway, back towards the daycare center where he suspected his children would arrive at 10:00am.  (Lollie Depo. at 59–60; FNBB Video at 9:50:10.)  As Lollie exited the FNBB skyway seating area, he encountered Hayne coming towards him through the skyway. (Lollie Depo. at 60; Hayne Depo. at 52–53; FNBB 9:50:10–9:50:29.)  Hayne claims she did not see precisely where Lollie stood up from, but did see him coming from the direction of the FNBB skyway seating area.  (Hayne Depo. at 51–52.)  What happened after this point is highly disputed.

Lollie claims that upon seeing Hayne, he stopped to speak with her.  (Lollie Depo. at 60; <u>see</u> FNBB Video at 9:50:25.[7])  Hayne asked Lollie what was happening and he told her "this is why I'm here, this is what I'm doing."  (Lollie Depo. at 60; <u>see</u> FNBB Video at 9:50:25–9:50:33.)  However, Lollie also claims that he explained to Hayne that he needed to get his children and requested that they "walk and talk."  (Lollie Depo. at 60.)  Lollie alleges that Hayne agreed and they proceeded through the skyway towards the daycare center.  (Lollie Depo. at 60, 89; <u>see</u> FNBB Video at 9:50:33–9:50:40 (showing Lollie and Hayne walking off into the skyway).)  Importantly, Lollie denies that Hayne touched him, ordered him to stop, or ordered him to produce identification at any time.  (Lollie Depo. at 89–91, 123, 127–28.)

Hayne agrees she encountered Lollie in the skyway section of the FNBB.  (Hayne Depo. at 52–53.)  Hayne alleges that she asked Lollie what was happening, but that he did not respond—or said, "nothing"—and attempted to walk around her.  (<u>Id.</u> at 62; Police Reports at 12.)  At that point, she claims that she grabbed or touched his arm and again asked to speak with him.  (Hayne Depo. at 63; Police Reports at 12; <u>see</u> FNBB Video at 9:50:25–9:50:33.[8])  Hayne described this touch as an attempt "to get [Lollie's] attention to get [Lollie] to stop."  (Police Reports at 12.)  Hayne alleges that Lollie "jerked his hand

---

[7] The quality of the FNBB video, especially given Lollie's distance from the camera, is poor.  However, Lollie can be seen stopping to speak with Hayne in the skyway.

[8] Because of the poor video quality, one cannot see clearly whether Hayne touched Lollie or if he attempted to walk around her.  What is clear is that Lollie stops for several seconds, presumably conversing with Hayne, before they walk off into the skyway together.

back" and repeatedly told her not to touch him.  (Hayne Depo. at 63; Police Reports at 12.)

She also claims that Lollie said "they didn't have to call the police."  (Hayne Depo. at 66.)

Hayne alleges that Lollie then "turned away, and with deliberation, walked away from [her],

northbound through the skyway."  (Police Reports at 12; Aff. of Lori Hayne ("Hayne Aff.")

at ¶ 2 [Doc. No. 30][9]; see Hayne Depo. at 62.)  However, Hayne agrees that, at some point

during the walk and talk, Lollie communicated his need to get his children from daycare.

(Police Reports at 12; Hayne Depo. at 68–69.)

Hayne claims she "was concerned that if [she] attempted to detain Lollie by [herself],

without any police backup, he would resist and possibly fight [her]."  (Hayne Aff. at ¶ 2.)

Hayne is approximately 5 feet 6 inches tall and 140 pounds, while Lollie is approximately 6

feet tall and 195 pounds.  (Id.)  Importantly, Hayne never explicitly claims she ordered

Lollie to stop before or during the walk and talk.  (See Hayne Depo.; Hayne Aff.; Police

Reports at 12–14; Hayne Aff.)

As Hayne and Lollie walked through the US Bank Building,[10] Hayne repeatedly

asked what was going on and requested Lollie provide his name.  (Hayne Depo. at 66;

Lollie Depo. at 60–61; Police Reports at 13; Hayne Aff. at ¶ 2.)  Lollie refused, based on his

belief that he had done nothing wrong and thus did not have to identify himself.   (Lollie

Depo. at 60–62, 84; Hayne Depo. at 69; Police Reports at 12–13)  Lollie also told Hayne

that he believed the reason he was asked to leave the FNBB skyway seating area was

_____

[9] Hayne filed a sworn affidavit, after her deposition was taken, which accompanied
Defendants' briefing in support of their Motion for Summary Judgment.

[10] The US Bank Building is situated between the FNBB and the Securian Building where
the daycare center is located.

8

because he was black, and that the seating area was public, not private.  (See Lollie Depo. at 58, 78–79; Hayne Aff. at ¶ 2; Police Reports at 13.)

During this time, Hayne allegedly radioed out to report that she was "following the uncooperative male" through the skyway in the US Bank Building.  (Hayne Aff. at ¶ 2; Hayne Depo. at 74; Police Reports at 13.)  Hayne also claims that she "continued to update [her] backup officers (Johnson and Schmidt) about [her] location and letting them know Lollie refused to stop or give his name."  (Hayne Aff. at ¶ 2.)  Johnson and Schmidt confirm receiving these updates from Hayne, claim that Hayne informed them that Lollie had been ordered to stop but refused, and allege that they could tell by the tone of Hayne's voice that she needed assistance.  (See Johnson Depo. at 30–32, 44–45[11]; Schmidt Depo. at 18; Police Reports at 6, 17.)  However, Lollie denies Hayne ever radioed out to report that she ordered Lollie to stop, or that he was refusing to comply with her orders.  (Lollie Depo. at 94, 123.)

Lollie felt as though Hayne's questioning was becoming "repetitive" and generally suggested she was not focused on what Lollie considered to be the "real issues," so he decided to film their interaction with his cellphone.  (See Lollie Depo. at 61–62, 88; Irlbeck Aff., Ex. 1 ("Lollie Video").)  A transcript of this video is also available.[12]  (See Aff. of Judith A. Hanson ("Hanson Aff.") [Doc. No. 31], Ex. G ("Lollie Video Tr.").)  Hayne asked Lollie to talk to her, explain what the problem was, and identify himself.  (Lollie

---

[11] Johnson also claims that in Hayne's radio communication(s), she stated that Lollie had pulled away from her and was videotaping her.  (Johnson Depo. at 31, 45.)

[12] Nowhere in this video can Hayne be seen or heard to radio out as the Officers allege above.  (See Lollie Video; Lollie Video Tr.)  However, this video recording only captures a portion of the walk and talk.

Video Tr. at 3[13]; Lollie Video at 0:00–1:12.)  Lollie asked why his identity was important,

suggested he did not have to identify himself, and told Hayne his version of the events at the

FNBB, including his belief that the skyway seating area was public and not private in part

because there were no signs designating it as private.  (Lollie Video Tr. at 3–4; Lollie Video

at 0:00–1:12.)  Nowhere in the video does Hayne order Lollie to stop, nor is there any

indication that she attempts to physically restrain him.  But see supra n.12.  Hayne described

Lollie's conduct during the walk and talk as, "he had an attitude or was belligerent and was

making continual statements."  (Hayne Depo. at 71.)  However, there is no allegation, nor

any evidence besides what is described herein, that Lollie physically or verbally threatened

Hayne, yelled, acted disorderly, or attempted to flee during the walk and talk.  (See Lollie

Video Tr. at 3–4; Lollie Video at 0:00–1:12.)

### C.  Johnson and Schmidt Arrive, Lollie Is Arrested

Johnson arrived on scene as Lollie and Hayne crossed into the Securian Building

through the skyway.  (Irlbeck Aff., Ex. 4 ("Side-by-Side Video").)[14]  Johnson stood 6 feet 4

inches tall and weighed 255 pounds.  (Johnson Depo. at 70.)  Johnson immediately

---

[13] The Court cites to the transcript page numbers, not the page numbers assigned by ECF.

[14] Lollie's interaction with the Officers once he reached the Securian Building was
captured by two video cameras.  The first is Lollie's cellphone video, which also captured
audio.  (See Lollie Video at 1:12–5:43.)  However, as described later, Hayne seized
Lollie's cellphone as the Officers arrested him, meaning that while it continued to record
audio, only part of the incident is visually captured.  (See Lollie Video at 1:55–5:43;
Lollie Video Tr.)  The second recording is from the Securian Building's security system,
which visually captured the entire incident, but did not capture any audio.  (See Irlbeck
Aff., Ex. 3 ("Securian Video").)  A side-by-side of the Lollie Video and Securian Video
was supplied and provides the most complete "picture" of the incident, including audio.
Thus, the Court relies primarily on the Side-by-Side Video in recounting the facts.

approached Lollie and Hayne, using his physical presence to guide Lollie to the side of the skyway while asking Lollie what was happening.  (Side-by-Side Video at 9:52:57–9:53:00.[15])  Johnson claims that as he approached, he heard Hayne tell Lollie to stop, and that Lollie ignored this command.  (Johnson Depo. at 34.)  However, the video contains no indication that Hayne ordered Lollie to stop at this time.  (Side-by-Side Video at 9:52:57–9:53:02; Lollie Video Tr. at 3–5.)  Lollie denies Hayne ever ordered him to stop.  (Lollie Depo. at 89–91, 123, 127–28.)

Lollie greeted Johnson and informed Johnson he needed to get his kids.  (Id. at 9:52:58–9:53:01; Lollie Video Tr. at 5.)  Johnson replied, "No."  (Side-by-Side Video at 9:53:01; Lollie Video Tr. at 5.)  Johnson then touched Lollie, directing him to the side of the skyway, to which Lollie verbally protested.[16]  (Side-by-Side Video at 9:53:02; Lollie Video Tr. at 5.)  Johnson claims that he was "forced to put [his] arm out to stop [Lollie] from going past [him]."  (Johnson Depo. at 58.)  Lollie alleges that he did not attempt to go past Johnson, that he immediately moved to the side of the skyway and stopped when Johnson approached, but that despite this, Johnson pushed him towards the wall.  (Lollie Depo. at 63, 89, 124.)

Within approximately eight seconds of arriving, Johnson announced, multiple times, that Lollie was going to go to jail.  (Side-by-Side Video at 9:52:57–9:53:05; Lollie Video

---

[15] The Court cites to the time stamp displayed on the Securian Building portion of the Side-by-Side Video.

[16] Lollie's verbal protests throughout the incident consisted primarily of assertions of his innocence, asking that the Officers not touch him or arrest him, and pleading with passersby for help.  (See Side-by-Side Video; Lollie Video Tr.)

Tr. at 5.)  Within those same eight seconds, Lollie stepped to the side of the skyway and stopped moving.  (Side-by-Side Video at 9:52:57–9:53:05.)  Johnson later stated that he believed "there was already a violation of the law" and that he was not going to "keep begging" Lollie to stop.  (Johnson Depo. at 58.)  Specifically, Johnson stated that upon arriving, he believed Lollie had committed trespass at the FNBB based on the information provided by FNBB security.  (See Johnson Depo. at 34–38.)  Johnson also believed that because Lollie allegedly refused to obey Hayne's order "[t]o stop and show identification," and because Lollie allegedly "pulled away from her," Lollie had committed obstruction of legal process.  (See id. at 44–45.)

Johnson stood on one side of Lollie while Hayne stood on the other.  (Side-by-Side Video at 9:53:05–9:53:15; Johnson Depo. at 59.)  During this time, Lollie verbally protested that he had done nothing wrong.  (Side-by-Side Video at 9:53:05–9:53:15; Lollie Video Tr. at 5–6.)  Johnson alleges that Lollie "bladed" or "squared up" towards Johnson, "widened his stance" and "pumping his right hand in and out of a fist," which Johnson took as Lollie preparing to fight.  (Johnson Depo. at 59–62.)  Lollie denies engaging in any of this behavior and claims he did not want to give the Officers a reason to escalate the situation.[17] (See Lollie Depo. at 63, 66, 125.)

---

[17] None of this behavior is readily apparent on the video recordings, but these recordings do not capture the incident from every angle.  Johnson also claims that the video recordings did not capture everything that was said and done during the incident. (Johnson Depo. at 55–56.)  For instance, Johnson alleges that he asked Lollie for his identification, but that this was not captured by the video.  (Johnson Depo. at 56–57, 65–66; Police Reports at 7; see Side-by-Side Video (Johnson cannot be heard asking Lollie for identification at any point); Lollie Video Tr. (containing no indication Johnson asked Lollie for identification).)

Johnson then gave numerous orders, in rapid succession, for Lollie to put his hands behind his back, and included a warning that if Lollie did not, "it's going to get ugly." (Side-by-Side Video at 9:53:15–9:53:31; Lollie Video Tr. at 6–7.)  Lollie verbally protested, but did not put both hands behind his back.[18]  (Side-by-Side Video at 9:53:15–9:53:31; but see Lollie Depo. at 97, 125–26 (claiming he put one of his hands behind his back).)  At this moment, Schmidt arrived on scene and joined Johnson and Hayne, standing in front of Lollie.  (Side-by-Side Video at 9:53:30.)

As Lollie continued to verbally protest, Schmidt drew his Taser, and Johnson told Lollie that he would be tased.  (Side-by-Side Video at 9:53:38–9:53:40; Lollie Video Tr. at 7.)  Hayne took ahold of Lollie's left arm, seizing his cellphone in the process, while Johnson took ahold of his right arm.  (Side-by-Side Video at 9:53:38–9:53:51; Johnson Depo. 70–71; Lollie Depo. at 91–92.)  Johnson alleges Lollie resisted the Officers' efforts to detain him by pulling away from their grasp, lowering his center of gravity, and attempted to break away.  (See Johnson Depo. at 70–75.)  Lollie denies he resisted or attempted to flee, (Lollie Depo. at 97–98, 125, 127), although he did continue to verbally protest and plead for someone to help him, (Lollie Video Tr. at 7–8).  Johnson pushed Lollie up against the wall, at which point Lollie claims Johnson choked him.  (Side-by-Side Video at 9:53:51–9:53:56; Lollie Video Tr. at 8; Lollie Depo. at 69, 92; see Johnson Depo. at 77 (admitting to holding Lollie against the wall).)

---

[18] This is apparent in part because Lollie continued to film the Officers with his cellphone, holding it in his left hand.

Lollie was given at least two more warnings that he would be tased as Johnson and Hayne restrained him against the wall, holding his arms, and Schmidt walked around Lollie's left side.  (Side-by-Side Video at 9:53:56–9:54:01; Lollie Video Tr. at 8.)  Johnson claims that he instructed Schmidt to tase Lollie.  (Johnson Depo. at 77; Police Reports at 7.)  Schmidt attempted to tase Lollie on his left leg, but missed.  (Side-by-Side Video at 9:53:58–9:54:00; Schmidt Depo. at 42.)  Schmidt immediately tried again and successfully tased Lollie on his left leg.  (Side-by-Side Video at 9:54:00–9:54:02; Schmidt Depo. at 43.)  All three Officers then took Lollie to the ground where he was handcuffed and searched.  (Side-by-Side Video at 9:54:03–9:54:55.)

What is not captured well in a written account of this incident is how quickly it progressed.  In just over one minute, Lollie is stopped, told he is going to jail, restrained against a wall, allegedly choked, tased, and taken to the floor by the Officers.  Besides the disputed facts recounted above, there is no allegation Lollie physically or verbally threatened the Officers, resisted, or attempted to flee.  Finally, besides what is recounted above, there is no evidence that the Officers conducted any investigation into any of the crimes Lollie was suspected of at the time (trespass at the FNBB and obstruction of legal process) before Lollie was arrested.

### D.  After Lollie's Arrest

Lollie was taken to jail and charged with trespassing, Minn. Stat. § 609.605, subd. 1(b)(3) (refusal to depart the premise of another), disorderly conduct, Minn. Stat. § 609.72, subd. 1 (brawling or fighting), and obstruction of legal process, Minn. Stat. § 609.50, subd. 1(1) (obstructing or preventing the lawful execution of legal process).  (Lollie Depo. at 72;

Irlbeck Aff., Ex. 14.)   Each offense was a misdemeanor.   All three charges were subsequently dismissed.   (Irlbeck Aff., Ex. 14.)   However, Lollie claims a variety of physical and mental injuries stemming from his arrest.   (See Lollie Depo. at 37–40, 108–10, 122–23; Irlbeck Aff., Ex. 15 (containing Lollie's therapy records).)

Lollie subsequently brought this suit against the Officers and the City of St. Paul. (See Compl. [Doc. No. 1-1].)   Lollie asserts three claims under 42 U.S.C. § 1983 for excessive force, (id. at ¶¶ 22–23 (Count 1)), false arrest, (id. at ¶¶ 24–25 (Count 2)), and an unreasonable Terry stop, (id. at ¶¶ 26–27 (Count 3)), against the Officers.[19]   Lollie also brings state law claims for battery, (id. at ¶¶ 28–30 (Count 4)), and false imprisonment, (id. at ¶¶ 31–33[20] (Count 5)), against all Defendants.   Defendants moved for summary judgment on all Counts.

## III.   DISCUSSION

### A.  Standard of Review

Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party

---

[19] Although the Complaint does not specify that Counts 1–3 are against only the Officers, those Counts can in fact only be asserted against the Officers and not the City of St. Paul. Municipalities are not liable for § 1983 violations by their employees under a theory of *respondeat superior*.  Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691 (1978).  Instead, a § 1983 claim against a municipality may only be sustained if it alleges the municipality employed a policy or standard that lead to the violation of the plaintiff's right(s).  Id. at 695.  There is no such allegation against the City of St. Paul here, nor is there any evidence to this effect.

[20] A typo caused the last two paragraphs of Count 5 to be mislabeled.  For the sake of clarity, the Court cites these paragraphs as if they were properly numbered in order with the preceding paragraphs.

is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249–50 (1986).  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" <u>Celotex Corp.</u>, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed.  <u>Id.</u> at 323.  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 256.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." <u>Id.</u> at 248.

Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp.</u>, 477 U.S. at 322.

### B.  Use of Force

Defendants first argue that the Officers' use of force was not excessive as a matter of law.  (Defs.' Mem. at 11–20.)  Defendants claim that Lollie's alleged physical resistance and refusal to obey the Officers' orders warranted the force used.  (<u>See</u> <u>id.</u>)

Viewing the facts in the light most favorable to Lollie, the Court cannot conclude Defendants are entitled to judgment in their favor as a matter of law.

Excessive force claims brought pursuant to 42 U.S.C. § 1983 are analyzed as seizures under the Fourth Amendment, meaning a reasonableness standard applies. Henderson v. Munn, 439 F.3d 497, 502 (8th Cir. 2006). The Supreme Court's "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396 (U.S. 1989). Thus, the test is "whether the amount of force used was objectively reasonable under the particular circumstances." Henderson, 439 F.3d at 502. Reasonableness is assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. Under this objective standard, an officer's subjective beliefs about what was happening are irrelevant. Shekleton v. Eichenberger, 677 F.3d 361, 364 n.4 (8th Cir. 2012). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them . . . ." Graham, 490 U.S. at 397.

"Circumstances relevant to the reasonableness of the officer's conduct include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Brown v. City of Golden Valley, 574 F.3d 491, 496 (8th Cir. 2009) (quoting Graham, 490 U.S. at 396). Although police often must make split-second decisions where a situation is "tense, uncertain, and rapidly evolving," Graham, 490 U.S.

at 397, this consideration is only relevant where there is evidence of such circumstances, see Brown, 574 F.3d at 497. "Moreover, it is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." Id. at 499.

The facts of Brown are markedly similar to those here. There, the passenger of a vehicle ("Sandra") brought an excessive force claim against an officer ("Zarrett") for forcefully removing her from the car, tasing her in the process. Brown, 574 F.3d at 494–95. The vehicle Sandra was riding in was pulled over at night along the side of a busy interstate on suspicion that the driver ("Richard") was under the influence. Id. at 493–94. Zarrett was not one of the initial officers on scene, but responded after hearing over the radio that Richard exited the vehicle and was refusing to get back in. Id. at 494. By the time Zarrett arrived, two other officers were on scene and were placing Richard in a squad car. Id.

Apparently frightened by the officers' behavior, Sandra called 911, but remained in the vehicle. Id. Zarrett, accompanied by the other officers, approached and ordered Sandra to get off the phone. Id. Sandra protested and said that she was frightened and wished to stay on the line with the 911 operator, at which point Zarrett again ordered her to hang up. Id. According to Sandra, Zarrett then tased her, grabbed her phone, threw it out the other side of the car, and dragged her out of the vehicle by her arm. Id. Zarrett and the other officers then allegedly bent Sandra's arms behind her back, causing her great pain which she attempted to alleviate by walking on her tiptoes. Id. Zarrett ordered that Sandra stop resisting, to which Sandra replied that she was not trying to resist. Id.

18

Zarrett's version of these events was somewhat different.  See id. at 495.  He claimed that another officer first ordered Sandra off of her phone, at which time Zarrett noticed two drink glasses at Sandra's feet.  Id.  He believed that these glasses might contain alcohol and that Sandra was intoxicated based on her disheveled appearance.  Id. Zarrett then ordered Sandra off the phone, but she refused.  Id.  Zarrett also claimed that he repeatedly ordered Sandra to unfasten her seatbelt, which she did not do.  Id.  At that point, Zarrett opened the passenger side door and Sandra scooted away from him, drawing her knees towards her chest in the process.  Id.  According to Zarrett, Sandra watched him unholster his Taser and he informed her that she would be tased if she did not comply.  Id.  Then, when Sandra was not looking, Zarrett grabbed her phone and applied the Taser to her arm.  Id.  Zarrett removed Sandra from the car at which point she continued to resist, despite his repeated commands to stop.  Id.

Sandra was charged with obstruction of legal process and an open bottle violation, charges which were eventually dismissed.  Id.  In Sandra's § 1983 suit, the district court denied Zarrett's motion for summary judgment based upon qualified immunity and Zarrett appealed.  Id. at 493.

The Eighth Circuit Court of Appeals held that Zarrett's conduct could not be considered objectively reasonable as a matter of law under these circumstances.  Id. at 496.  The Court noted that the crime Zarrett suspected Sandra of committing, an open bottle violation, was a nonviolent misdemeanor offense.  Id. at 496–97.  Nor could the Court conclude that the situation was "tense, uncertain, and rapidly evolving," in a way

that required Zarrett to make any split-second decisions.   Id. at 497.   Considering

Sandra's versions of events, the Court held:

> In a word, then, nothing in the record indicates that Sandra was actively
> resisting arrest as she sat in the car or that she was attempting to evade
> arrest by flight.  Her principal offense, it would appear, was to disobey the
> commands to terminate her call to the 911 operator.  Whether Zarrett
> reasonably interpreted her refusal as a realistic threat to his personal safety
> or whether it constituted nothing more than an affront to his command
> authority is a matter for a jury to decide.

Id.

Here, Lollie's account of the incident, corroborated to some extent by the video

evidence, creates facts similar to Brown.  Lollie calmly "walked and talked" with Hayne

for several minutes, although he did refuse to identify himself.  There is no indication he

attempted to flee, or posed any danger to the public.  There is no evidence the situation

was tense or rapidly evolving such that it required the Officers to make split-second

decisions.  Moreover, there was little if any evidence of a threat to the Officers' safety.[21]

Lollie never physically or verbally threatened the Officers.   The crime Lollie was

suspected of was a nonviolent misdemeanor trespass.   These facts show a suspected

nonviolent misdemeanant who did not flee or actively resist arrest and posed little risk to

officer safety or the public, meaning the use of force was least justified.  See Brown, 574

---

[21] By Lollie's account, at the point there was any physical contact between him and the
Officers, both Hayne and Johnson were on scene and Schmidt arrived moments later.
Johnson is substantially larger than Lollie in terms of physical stature.  Furthermore, the
brightly lit, pedestrian skyway did not present any inherent risk to officer safety like a
busy roadway might during a nighttime traffic stop.  See Brown, 574 F.3d at 498 (finding
that despite the use of force taking place during a nighttime traffic stop along a busy
interstate, there was *not* a clear threat to officer safety based on the plaintiff's version of
events).

F.3d at 499 ("At the time Zarrett deployed his Taser and arrested Sandra, the law was sufficiently clear to inform a reasonable officer that it was unlawful to Taser a nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's commands was to disobey two orders to end her phone call to a 911 operator."); Shekleton, 677 F.3d at 364 (where, based on the evidence, plaintiff claimed he was an "unarmed suspected misdemeanant, who did not resist arrest, did not threaten the officer, did not attempt to run from him, and did not behave aggressively towards him," the officer's use of a Taser against the plaintiff precluded granting the officer's motion for summary judgment); Montoya v. City of Flandreau, 669 F.3d 867, 871 (8th Cir. 2012) (where plaintiff argued that the evidence showed she was a suspected nonviolent misdemeanant who "was not threatening anyone, was not actively resisting arrest, and was not attempting to flee," it could not be said that officer's use of a "leg sweep" on her was objectively reasonable as a matter of law).

Whether Lollie's alleged challenge to the Officers' "command authority"[22] and resistance justified the force used against him is for the jury to decide. See Brown, 574 F.3d at 497 ("Zarrett's contention that he thought Sandra might kick him when she raised her knees to her chest while cowering in the car might be accepted by a jury, but a jury

---

[22] Verbally challenging an officer's authority, or criticizing an officer's actions, does not constitute unlawful conduct so long as it does not impede the officer's duties. See City of Houston, Tex. v. Hill, 482 U.S. 451, 463 n.12 (1987) (holding such verbal challenges to be protected speech under the First Amendment). Nor does such criticism justify the use of force against an arrestee. See Mann v. Shevich, No. 08-cv-5202 (ADM/RLE), 2010 WL 653867, at *3 n.4 (D. Minn. Feb. 23, 2010).

could just as well interpret that conduct as an instinctive self-protective reaction consistent with Sandra's fear.").   On these facts, the Court cannot conclude that the rapid progression in the Officers' use of force, or the force they used, was objectively reasonable as a matter of law.   A jury must decide whose account of this incident to believe and whether the Officers' use of force was excessive under those circumstances. See Henderson, 439 F.3d at 504 (8th Cir. 2006) ("[I]t is not [the court's] function to remove the credibility assessment from the jury." (quotation omitted)).

### C. Qualified Immunity

Defendants argue that they are entitled to qualified immunity from Lollie's claims for excessive force, false arrest, unlawful stop, and false imprisonment.   (Defs.' Mem. at 21–26.)   Defendants claim that the Officers' conduct did not violate any of Lollie's clearly established rights,[23] (id. at 21–23), that the Officers had reasonable suspicion to stop Lollie and arguable probable cause to arrest him, (id. at 23–25), and that Lollie cannot sustain his claim for false imprisonment because his arrest was lawful, (id. at 26).

Qualified immunity protects government officers from § 1983 liability "unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known."   Brown, 574 F.3d at 495.   Thus, the Court must perform a two-part analysis to determine if qualified immunity applies: (1) decide whether the facts show the violation of a constitutional or statutory right, and (2)

---

[23] Defendants describe the right at issue as Lollie's "right to disregard the lawful commands of the officers."   (Defs.' Mem. at 21.)   Lollie claims no such right.   Instead, Lollie alleges his Fourth Amendment rights to be free from excessive force and unlawful seizure were violated by the Officers' conduct.   (See Pl.'s Opp. at 18–19.)

determine whether that right was clearly established at the time of the alleged misconduct.[24] <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001); <u>see</u> <u>Brown</u>, 574 F.3d at 496.

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

<u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002) (quotations and citations omitted).  "The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted." <u>Saucier</u>, 533 U.S. at 194–95.

The Fourth Amendment rights to be free from excessive force and unlawful arrest were clearly established at the time of Lollie's arrest.  See <u>Graham</u>, 490 U.S. at 396; <u>Brown</u>, 574 F.3d at 499; <u>Walker v. City of Pine Bluff</u>, 414 F.3d 989, 992 (8th Cir. 2005). Thus, the Court considers whether the facts, taken in the light most favorable to Lollie, establish a violation of these rights.  For the reasons discussed below, the Court finds as a matter of law that Johnson and Hayne had reasonable suspicion to stop Lollie and dismisses Lollie's § 1983 claim based on an unlawful stop.  However, the Court also finds that the Officers likely lacked arguable probable cause to arrest Lollie for trespass. Whether the Officers had arguable probable cause to arrest Lollie for trespass, disorderly

---

[24] Courts may address the prongs of the qualified immunity analysis in whatever order they please.  <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009).

conduct or obstruction of legal process, and whether the force they used to effectuate that arrest was excessive, are questions of fact for a jury to decide.[25]

### 1. Lollie's § 1983 claim based on an alleged unlawful <u>Terry</u> stop

Lollie claims that the Officers violated his Fourth Amendment rights by stopping him without reasonable suspicion.  (<u>See</u> Compl. at ¶¶ 26–27.)  Defendants argue that the Officers, relying on the information provided to them by FNBB security, had the reasonable suspicion necessary to stop Lollie and investigate whether he was trespassing. (Defs.' Mem. at 25.)  The Court finds that the Officers had reasonable suspicion to stop Lollie and thus are entitled to qualified immunity against Lollie's related § 1983 claim.

"Not every contact between law enforcement officers and citizens constitutes a Fourth Amendment 'seizure.'"  <u>United States v. Dixon</u>, 51 F.3d 1376, 1379 (8th Cir. 1995).  Whether a seizure occurred depends on if, under the circumstances, a reasonable person would believe he/she was free to leave.  <u>Dixon</u>, 51 F.3d at 1379.  "For example, a seizure does not ordinarily occur when a police officer approaches an individual and asks for identification or asks a few questions."  <u>Id.</u>  Thus, there must be some physical

---

[25] Qualified immunity is a question of law for the Court, not an issue for the jury.  <u>See</u> <u>Littrell v. Franklin</u>, 388 F.3d 578, 584 (8th Cir. 2004).  "The issue of qualified immunity, however, is frequently intertwined with unresolved factual questions."  <u>Littrell</u>, 388 F.3d at 585.  Under such circumstances, a court may put specific factual interrogatories to the jury and then rely upon the jury's factual findings to make a qualified immunity ruling. <u>Id.</u>  Here, certain factual issues must be resolved by a jury before the Court can decide whether Defendants are entitled to qualified immunity on many of Lollie's claims.  These factual determinations include, but are not limited to, whether the Officers had arguable probable cause to arrest Lollie for trespass, disorderly conduct or obstruction of legal process, whether Lollie resisted, and whether the force the Officers employed was excessive under the circumstances.

application of force by an officer, or submission to an officer's "assertion of authority," to constitute a stop/seizure.  Id.

"Investigative stops[26] and arrests are 'seizures' within the meaning of the fourth amendment, and thus require some particularized and objective justification; voluntary communication does not.  An investigative stop by a law enforcement officer must be supported by a reasonable and articulable suspicion of criminal activity."  United States v. Ilazi, 730 F.2d 1120, 1123 (8th Cir. 1984).   Reasonable suspicion requires a basic level of objective justification, more than "inchoate and unparticularized suspicion or 'hunch,'" but less than the probable cause necessary for an arrest.  United States v. Sokolow, 490 U.S. 1, 7 (1989) (quotations and citations omitted).  Police officers may rely on information provided to them by others, such as witnesses or other officers, when formulating reasonable suspicion, so long as the source of that information carries some minimal indicia of reliability.  United States v. Maltais, 403 F.3d 550, 554 (8th Cir. 2005); see Adams v. Williams, 407 U.S. 143, 147 (1972).

Lollie was not stopped/seized until Johnson arrived and confronted Lollie as he entered the Securian Building.  The fact that Lollie "walked and talked" with Hayne from the FNBB to the Securian Building suggests that he had not submitted to any "assertion of authority" and felt free to leave.  See Dixon, 51 F.3d at 1379.  However, immediately upon Johnson's arrival, Lollie was literally stopped.  Johnson physically inserted himself

---

[26] Investigatory stops are commonly referred to as Terry stops after Terry v. Ohio, 392 U.S. 1 (1968).

in Lollie's path, directing him to the side of the skyway, and Lollie complied. Thus, the Court examines the basis for Johnson's stop of Lollie.

According to Lollie, Johnson "knew" the following upon stopping him: (1) that FNBB security had requested assistance with an uncooperative male who would not leave what was allegedly a private seating area, and (2) that Hayne was following an individual who matched the description of the uncooperative male through the skyway. Johnson was entitled to rely on the information given to him by FNBB security and Hayne. See Maltais, 403 F.3d at 554. Based on this information, Johnson had reasonable suspicion, supported by articulable facts, to believe Lollie may have trespassed at the FNBB. See Minn. Stat. § 609.605, subd. 1(b)(3) (misdemeanor trespass occurs when a person intentionally "trespasses on the premises of another and, without claim of right, refuses to depart from the premises on demand of the lawful possessor"). Thus, the Officers did not violate Lollie's Fourth Amendment rights by stopping him and they are entitled to qualified immunity against Lollie's related § 1983 claim.

### 2. Lollie's arrest and the force used to effectuate it

Lollie alleges that the Officers violated his Fourth Amendment rights by arresting him without the necessary probable cause. (Compl. at ¶¶ 24–25.) Because the Officers lacked legal justification to arrest him, Lollie also claims that his arrest constituted false imprisonment. (Id. at ¶¶ 31–33.) Finally, Lollie asserts that the force the Officers used in effectuating his arrest was excessive and a violation of his Fourth Amendment rights. (Id. at ¶¶ 22–23.) Defendants allege that they had the probable cause necessary to arrest Lollie, meaning Lollie's arrest was legally justified, and that the force the Officers used

26

against him was not excessive.  (Defs.' Mem. at 21–26.)

"A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'"  Ulrich v. Pope County., 715 F.3d 1054, 1059 (8th Cir. 2013) (quotations omitted).  Where the totality of the circumstances at the time of an arrest would allow a reasonable officer to believe the suspect had or was committing a crime, there is probable cause.  Borgman v. Kedley, 646 F.3d 518, 523 (8th Cir. 2011). "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is 'objectively reasonable.'"  Ulrich, 715 F.3d at 1059 (quotations omitted).

In formulating probable cause, officers necessarily receive "substantial latitude in interpreting and drawing inferences from factual circumstances."  United States v. Washington, 109 F.3d 459, 465 (8th Cir. 1997) (quotations omitted).  However, this latitude is subject to at least two important limits:

> First, because the *totality* of circumstances determines the existence of probable cause, evidence that tends to negate the possibility that a suspect has committed a crime is relevant to whether the officer has probable cause. An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists.  In this sense, the Fourth Amendment requires that we analyze the weight of all the evidence—not merely the sufficiency of the incriminating evidence . . . .

Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999) (citations omitted).  Second, law enforcement officers must "conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances . . . ."  Kuehl, 173 F. 3d at 650.

27

"An officer need not conduct a 'mini-trial' before making an arrest, but probable cause does not exist when a 'minimal further investigation' would have exonerated the suspect." Id. (citations omitted).  The duty to conduct this minimal further investigation is well established in Eighth Circuit precedent.  See El-Ghazzawy v. Berthiaume, 708 F. Supp. 2d 874, 885 (D. Minn. 2010) aff'd, 636 F.3d 452 (8th Cir. 2011) (citing to Kuehl).  Where an officer conducts no investigation prior to arrest, and there are no exigent circumstances, that officer cannot enjoy qualified immunity against a § 1983 claim for false arrest.  See El-Ghazzawy, 708 F. Supp. 2d at 884–85.

Here, taking Lollie's facts as true, the Officers likely lacked even arguable probable cause to arrest Lollie for trespass.  The Officers failed to establish probable cause in two ways.  First, Hayne and Johnson ignored exculpatory evidence which suggested that Lollie had not trespassed at the FNBB.  Lollie repeatedly explained to Hayne his belief that the FNBB seating area was public in part because there were no signs designating the area as private—implying that he had a right to be there.  Lollie also repeatedly professed his innocence, claiming he had done nothing wrong.  While these facts did not "prove" Lollie's innocence, they warranted conducting further investigation before arresting Lollie.

Second, the Officers conducted *no* further investigation into whether Lollie had in fact trespassed at the FNBB before arresting him.[27]  Hayne did walk and talk with Lollie,

---

[27] Whether the FNBB skyway seating area was public or private is not really material to deciding Defendants' Motion for Summary Judgment.  Hayne and Johnson reasonably relied, at least in part, on the information given to them by FNBB security in formulating their belief the seating area was private.  See Maltais, 403 F.3d at 554 (allowing such

but she focused almost exclusively on ascertaining Lollie's identity—a fact of little consequence to the crime of trespass.  Whatever Hayne learned during this time, she did not communicate it to the other Officers.  Upon arriving on the scene, Johnson made no effort whatsoever to investigate the trespass claim.  Instead, literally within seconds of his arrival, Johnson announced Lollie was going to go to jail.  There is no indication of any exigent circumstances (e.g., an attempt to flee, a threat to officer or public safety, a lack of other officers on scene) excusing the Officers from engaging in at least some minimal amount of further investigation before arresting Lollie for trespass.   Under these circumstances, it was likely objectively unreasonable for the Officers to believe they had probable cause to arrest Lollie for trespass.

Although the Officers may have lacked arguable probable cause to arrest Lollie for trespass, this does not end the probable cause inquiry.  An arrestee's response to even "an invalid arrest or <u>Terry</u> stop may constitute independent grounds for arrest." <u>United States v. Dawdy</u>, 46 F.3d 1427, 1431 (8th Cir. 1995); <u>see</u> <u>Binion v. City of St. Paul</u>, 788 F. Supp. 2d 935, 945 n.8 (D. Minn. 2011) (noting that resisting an invalid arrest may constitute probable cause for disorderly conduct).   Thus, it is possible that Lollie's alleged conduct, both during the walk and talk or after Lollie was stopped, could form an independently valid basis for arrest for disorderly conduct or obstruction of legal process.

---

reliance by officers on information provided by victims or witnesses).  Even if the seating area was in fact public, the Officers could still form the arguable probable cause necessary to arrest Lollie for trespass.  <u>See</u> <u>Ulrich</u>, 715 F.3d at 1059 (arguable probable cause can be mistaken, so long as the mistake is objectively reasonable).  Instead, the problem is the Officers conducted *no* further investigation, despite a lack of exigent circumstances, and ignored some exculpatory evidence.

However, disputed issues of material fact abound (e.g., whether Hayne ordered Lollie to stop or produce identification, whether Hayne communicated Lollie's alleged refusal to comply to Johnson and Schmidt, whether Lollie disobeyed Johnson's commands, whether Lollie resisted the Officers' attempts to detain him) and prevent the Court from concluding the Officers are entitled to qualified immunity at this time.[28] See Giordano v. Lee, 434 F.2d 1227, 1230 (8th Cir. 1970) ("[I]n [claims under 42 U.S.C. § 1983], where a genuine issue of fact on the existence of probable cause for arrest is presented, the question should be submitted to the jury."); Hoffmeyer v. Porter, 758 F.3d 1065, 1068 (8th Cir. 2014) (citing Giordano with approval and upholding a district court's decision to put the issue of probable cause to a jury).

Finally, Defendants argue that because they had probable cause to arrest Lollie, he cannot sustain his state law claim for false imprisonment, or in the alternative that they are entitled to qualified immunity.  (Defs.' Mem. at 26.)  "An arrest made without proper legal authority is a false arrest, and any subsequent restraint is false imprisonment." Binion, 788 F. Supp. 2d at 949 (quotations omitted) (examining Minnesota law).  If an arrest is made without at least arguable probable cause, it lacks legal authority.  See id. As just described, whether the Officers had arguable probable cause necessary to arrest Lollie, and thus whether the Officers carried the necessary legal authority, depends on disputed material facts.

---

[28] Similarly, whether the force used by the Officers to effectuate Lollie's arrest was excessive involves fact questions that preclude finding qualified immunity at this time. See supra Part III.B.

### D. Battery and Official Immunity

Lollie asserts a claim for battery against Defendants. (Compl. at ¶¶ 28–30.) Defendants argue that because Lollie cannot show the Officers' use of force was excessive, he cannot sustain his battery claim as a matter of law. (Defs.' Mem. at 27–28.) Alternatively, Defendants assert that the Officers are entitled to official immunity against Lollie's battery claim, and the City is entitled to vicarious official immunity against the same.[29] (Id. at 28–30.)

In Minnesota, battery is defined as intentional, unpermitted, offensive contact with another. Paradise v. City of Minneapolis, 297 N.W.2d 152, 155 (Minn. 1980). However, police officers may use reasonable force to conduct lawful arrests. Minn. Stat. § 609.06, subd. 1(1)(a). "For the use of force to be unreasonable, the Plaintiff bears the burden of proving that force was excessive or unreasonable." Tillis v. City of Minneapolis, No. 12-cv-324 (ADM/TNL), 2013 WL 6062187, at *10 (D. Minn. Nov. 18, 2013).

The Minnesota doctrine of official immunity "protects from personal liability a public official charged by law with duties that call for the exercise of judgment or discretion unless the official is guilty of a wilful [sic] or malicious wrong." Rico v. State, 472 N.W.2d 100, 106–07 (Minn. 1991). Intentionally doing a wrongful act without legal justification or the willful violation of a known right will divest an officer of official immunity. See id. at 107. "Whether or not an officer acted maliciously or willfully is

---

[29] Although not specifically argued by Defendants, presumably they claim official immunity from Lollie's state law claim for false imprisonment. However, because disputed material facts abound, the Court cannot find Defendants are entitled to official immunity as a matter of law at this time. See supra Part III.C.2.

usually a question of fact to be resolved by a jury." <u>Johnson v. Morris</u>, 453 N.W.2d 31, 42 (Minn. 1990).

As described above, the Court cannot conclude as a matter of law that the Officers' use of force against Lollie was not excessive under the circumstances. Nor can it conclude that the Officers' arrest of Lollie carried the requisite probable cause to be lawful. These issues depend on disputed material facts. Deciding whether the Officers, and thus the City, are entitled to official immunity, must await a jury's fact determinations. See <u>Brown</u>, 574 F.3d at 501; <u>Binion</u>, 788 F. Supp. 2d at 949–50.

**E. Failure to Intervene**

In responding to Defendants' Motion for Summary Judgment, Lollie moved to assert a new claim against Hayne for failure to intervene in violation of 42 U.S.C. § 1983. (Pl.'s Opp. at 36–37.) Lollie alleges that Hayne had both the means and opportunity to intervene and prevent excessive force from being used against him, but instead used excessive force herself. (See <u>id.</u>) He further argues that Federal Rule of Civil Procedure 15(b) allows such a late amendment, that the Complaint and facts developed during discovery provided notice of the allegation (despite it not being specifically pled), and that Defendants will suffer no prejudice by allowing the claim because they "would not have conducted discovery any differently had they been given explicit notice . . . ." (See <u>id.</u> at 36.) Defendants object to this late amendment. (Defs.' Reply at 12.) They claim, "Lollie has not convincingly argued or shown any new evidence came to light during discovery, where justice would require an amendment, or it would aid in presenting the merits," as required by Federal Rule of Civil Procedure 15. (<u>Id.</u>) Alternatively,

Defendants assert that since they are entitled to qualified immunity against Lollie's excessive force claim, his proposed failure to intervene claim would be "a nullity." (Id.)

The Federal Rules of Civil Procedure allow for amending the pleadings at various stages of litigation. See Fed. R. Civ. P. 15. Amendments may occur during or even after trial. See Fed. R. Civ. P 15(b). Before trial, a party may amend the pleadings with the leave of the court, which should be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2).

As an initial matter, Lollie's reliance on Rule 15(b) is misplaced. That portion of the Rule, by its very title, addresses amendment during or after trial. No trial on Lollie's claims has occurred, making the standard for post-trial amendment under Fed. R. Civ. P. 15(b)(2) inapplicable. Instead, the Court construes Lollie's motion as one for leave to amend the pleadings pursuant to Fed. R. Civ. P. 15(a)(2).

However, it is actually Rule 16 which governs Lollie's requested amendment. The Court previously issued a scheduling order in this matter that required the parties to file any motion seeking to amend the pleadings by March 2, 2015. (Pretrial Scheduling Order dated 12/29/2014 at 1.) Scheduling orders may only be modified for good cause. Fed. R. Civ. P. 16(b)(4).

> When a party seeks to amend a pleading after the scheduling deadline for doing so, the application of Rule 16(b)'s good-cause standard is not optional. To permit district courts to consider motions to amend pleadings under Rule 15(a) without regard to Rule 16(b) 'would render scheduling orders meaningless and effectively . . . read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure.'

Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 716 (8th Cir. 2008) (quoting Sosa v.

Airprint Sys., Inc., 133 F.3d 1417, 1419 (11th Cir. 1998)).  The moving party's diligence in attempting to comply with a scheduling order is the primary consideration when assessing good cause.  See Sherman, 532 F.3d at 716–17.  When a party became aware of the claim or defense to be added is highly relevant to assessing such diligence.  See id. at 717–18 (finding no good cause where the party seeking amendment became aware of the affirmative defense more than seven months before it sought leave to add the defense).

Lollie has not shown the good cause necessary to allow his requested amendment.  Lollie does not allege that newly discovered evidence alerted him to his failure to intervene claim.  Rather, Lollie was aware of this claim since at least July of 2015 when his deposition occurred.[30]  (See Lollie Depo. (conducted 7/30/2015).)  During that deposition, Lollie repeatedly stated his opinion that it was Hayne's duty to protect him and try to defuse the situation once Johnson and Schmidt arrived, but that she failed to do so.  (See id. at 64, 96, 119–20, 130–31.)  However, Lollie did not seek to amend his Complaint for nearly four months after that deposition—a full eight months after the Scheduling Order's deadline for such amendments.  In short, Lollie has not presented any compelling argument as to why his failure to intervene claim was not brought sooner and thus he has not shown the required good cause.  See Target Corp. v. LCH Pavement Consultants, LLC, 960 F. Supp. 2d 999, 1008-09 (D. Minn. 2013) (denying movant's request to amend the complaint to add additional claims where movant failed to show why the claims to be added could not have been brought earlier).

---

[30] In all likelihood, Lollie was aware of this claim since the incident, since his version of events has not changed in any material way since he filed his Complaint.

34

## IV.    CONCLUSION

Lollie's 42 U.S.C. § 1983 claim premised on an unlawful <u>Terry</u> stop is dismissed because the Officers had reasonable suspicion to stop Lollie and question him about the trespassing call they received.  However, disputed issues of fact preclude the Court from granting Defendants summary judgment on Lollie's other claims.  These fact questions include, but are not limited to: (1) whether the force used by the Officers was excessive under the circumstances, (2) whether Lollie resisted arrest or gave the Officers reason to fear for their safety, (3) whether the Officers had probable cause to arrest Lollie for trespass, disorderly conduct or obstruction of legal process, and (4) whether the Officers' use of force against, or detention of, Lollie was willful or malicious.

## V.    ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Mot. for Summary Judgment [Doc. No. 27] is **GRANTED IN PART AND DENIED IN PART** as follows:

   a. Plaintiff's 42 U.S.C. § 1983 claim based on an alleged unlawful <u>Terry</u> stop (Compl. at ¶¶ 26–27 (Count 3) [Doc. No. 1-1]) is **DISMISSED WITH PREJUDICE**;

   b. Defendants' Mot. for Summary Judgment is in all other respects **DENIED**.

2. Plaintiff's motion to amend the pleadings to add a claim under 42 U.S.C. § 1983 for failure to intervene against Defendant Lori Hayne (Pl.'s Opp. at 36–37 [Doc. No. 33]) is **DENIED**.


Dated:  February 4, 2016                    s/ Susan Richard Nelson
                                            SUSAN RICHARD NELSON
                                            United States District Judge